1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

OPPENHEIMER & CO. INC.,

                Plaintiff,

      v.

STEVEN MITCHELL, DORI
MITCHELL, JEROME HOPPER, and
LORI HOPPER,

                Defendants.

CASE NO. C23-67 MJP

ORDER GRANTING MOTION
FOR PRELIMINARY
INJUNCTION

This matter comes before the Court on Plaintiff's Motion for Preliminary Injunction.
(Dkt. No. 22.) Having reviewed the Motion, Defendants' Opposition (Dkt. No. 32), the Reply
(Dkt. No. 39), and all supporting materials, and having held oral argument on March 8, 2023, the
Court GRANTS the Motion and PRELIMINARILY ENJOINS Defendants from pursuing their
claims against Oppenheimer in the FINRA arbitration.

1

**BACKGROUND**

2          Plaintiff Oppenheimer & Co., Inc. filed this declaratory judgment action to avoid having

3   to arbitrate claims that the four Defendants assert against it in a Financial Industry Regulatory

4   Authority (FINRA) arbitration. (See Complaint ¶ 67 (Dkt. No. 1).) Oppenheimer is a member of

5   FINRA, which is "a non-governmental, self-regulatory agency that has the authority to exercise

6   comprehensive oversight over all securities firms that do business with the public." See

7   Goldman, Sachs & Co. v. City of Reno, 747 F.3d 733, 737 (9th Cir. 2014). Defendants

8   commenced the arbitration to recover funds they invested and lost in a private equity fund called

9   Horizon Private Equity III LLC ("Horizon") that an Oppenheimer-registered broker, John

10  Woods, allegedly created and operated that was a Ponzi scheme. Oppenheimer now seeks a

11  preliminary injunction to bar Defendants from pursuing claims in the FINRA arbitration set to

12  commence on March 20, 2023.

13         To resolve the Motion, the Court must examine whether the FINRA proceeding was

14  properly commenced against Oppenheimer. The parties agree that the critical issue is whether

15  Defendants were Oppenheimer's "customers," as that term is used by FINRA Rule 12200.

16  Although the FINRA rule defines "customer" with great breadth, the Ninth Circuit has narrowed

17  its reach to include only those who "purchase[] commodities or services from a FINRA member

18  [or associated person of the FINRA member] in the course of the member's FINRA-regulated

19  business activities, i.e., the member's investment banking and securities business activities."

20  FINRA Rule 12200, Reno, 747 F.3d at 741. To understand whether Defendants are "customers"

21  of Oppenheimer, the Court reviews the facts surrounding the Horizon Ponzi scheme, Defendants'

22  investment in Horizon, and Defendants' relationship to Oppenheimer.

23

24

A.      **The Horizon Ponzi Scheme**

In the arbitration proceeding, Defendants allege that from 2003 through the end of 2016, John Woods, while a registered broker of Oppenheimer, operated Horizon as a $110 million Ponzi scheme through which Defendants lost several millions of dollars. (Statement of Claim at 1-2 (Declaration of William E. Mahoney, Jr. Ex. A (Dkt. No. 23)).) They allege that Woods created Horizon while at Oppenheimer and that Woods used his status as a registered Oppenheimer broker to convinced the public to invest. It is undisputed that Woods was a registered broker of Oppenheimer until December 2016. (Declaration of Craig H. Kuglar ¶ 5 & Ex. B at 3 (Dkt. No. 33).)

Woods formed Horizon in 2007 after changing the name of a company he had created in 2006. (Declaration of Craig Kuglar ¶¶ 9-12.) Woods also owned an entity called Southport Capital, a registered investment advisory firm that was involved in the Horizon scheme with offices across the hall from Oppenheimer's Atlanta branch. (Declaration of Michael Mooney ¶¶ 6-7 (Dkt. No. 34).) Woods recruited Michael Mooney (his cousin) to work at Southport, and Mooney left Oppenheimer in 2010 to work for Southport as an investment advisor. (Mooney Decl. ¶ 7; Kuglar Decl. Ex. J at 3 (Oppenheimer Answer to Statement of Claim) (Dkt. No. 33 at 187).; Mahoney Decl. ¶ 4 and Ex. B at 3; Declaration of Michelle Alvarez ¶ 13.) Mooney testified in a prior FINRA arbitration that Woods led him to believe that Horizon was "a fund created under the umbrella of Oppenheimer" that would "be all through Oppenheimer" as a "part of Oppenheimer's program." (Kuglar Decl. ¶ 14 and Ex. H.) Mooney states that while he was an investment advisor with Southport, he marketed Horizon to the investing public at Woods' direction and received sales commissions based on the amount each person invested in Horizon. (Mooney Decl. ¶¶ 7, 9, 11.)

1    Defendants allege that "for nearly a decade, Oppenheimer permitted and assisted Woods

2    and its representatives in selling Horizon Ponzi scheme investments to Oppenheimer customers

3    and the investing public." (Statement of Claim at 1-2.) Defendants allege that Woods "traded

4    heavily on his prestigious affiliation with Oppenheimer" to dupe investors, and that

5    "Oppenheimer held Woods out to the investing public as its agent." (Id. at 5.) Defendants allege

6    that "Oppenheimer's management actively assisted Woods' fraud as he funneled investor money

7    into the Horizon Private Equity scheme." (Id.) Defendants also allege that Oppenheimer failed to

8    supervise Woods while he was a licensed representative of Oppenheimer. (Id.)

9    **B.    Defendants' Investment in Horizon**

10    Defendants Steven and Dori Mitchell allege that they lost their $1.6 million investment in

11    Horizon after being told by "Woods' agent, Michael Mooney, that Horizon was a safe, low-risk

12    investment." (Statement of Claim at 2.) The Mitchells made their investment in 2016, though

13    they fail to specify precisely with whom they invested. (Id.; Declaration of D. Mitchell ¶ 9 (Dkt.

14    No. 35); Declaration of S. Mitchell ¶ 9 (Dkt. No. 36).) And account statements provided to the

15    Court only show that they held investments in Horizon, not the entity through whom they

16    purchased interests Horizon. (Dkt. Nos. 44, 47.) In their opposition brief, the Mitchells appear to

17    concede that they invested in Horizon through Mooney, not Woods. (Opp. at 13 ("They were

18    sold the securities by Woods's agent, Michael Mooney.").) Mooney offers some additional

19    detail. Mooney states that after he met with the Mitchells, he "suggested" to Woods that he send

20    the Mitchells Horizon subscription materials, which the Mitchells "completed and returned to

21    John Woods at the Oppenheimer Atlanta branch office." (Mooney Decl. ¶ 11.) The Mitchells

22    insist that they were told Woods was the investment manager and associated with Oppenheimer.

23    (D. Mitchell Decl. ¶¶ 5, 7, 9; S. Mitchell Decl. ¶¶ 5, 7, 9.) And they claim that after they

24

1    invested, Woods sent them his Seahawks tickets for a game as a "thank you. (D. Mitchell Decl. ¶

2    10; S. Mitchell Decl. ¶ 10.)

3        Defendants Jerome and Lori Hopper invested $600,000 in Horizon in 2016 after being

4    pitched by "Oppenheimer financial advisor John Woods and Michael Mooney" that the

5    investment was "virtually risk-free." (Statement of Claim at 3, 5.) Like the Mitchells, the

6    Hoppers' declarations fail to identify who they purchased the securities from, stating only that

7    they "made [their] initial investments in John Woods' investment program, Horizon Private

8    Equity" in 2016. (See Declaration of J. Hopper ¶ 7; Declaration of L. Hopper ¶ 7.) And like the

9    Mitchells, the Hoppers account statements only show that they held investments in Horizon, not

10   the entity through whom they purchased interests in Horizon. (J. Hopper Decl. ¶ 10; L. Hopper

11   Decl. ¶ 10.) Mooney adds some further detail, identical to what he represents as to the Mitchells.

12   Mooney states that after he met with the Hoppers, he "suggested" to Woods that he send the

13   Hoppers Horizon subscription materials, which the Hoppers "completed and returned to John

14   Woods at the Oppenheimer Atlanta branch office." (Mooney Decl. ¶ 11.)

15       The parties agree that Defendants had no direct relationship with Oppenheimer. None of

16   the Defendants had accounts with Oppenheimer, received account statements from

17   Oppenheimer, entered into any agreement with Oppenheimer, purchased any security or service

18   from Oppenheimer, or had a written agreement of any kind with Oppenheimer. (Declaration of

19   Michelle Alvarez ¶¶ 4-11 (Dkt. No. 24).) Oppenheimer also provides evidence that Michael

20   Mooney was not associated with or employed by Oppenheimer in 2016 when Defendants allege

21   Mooney pitched them on investing in Horizon. (Id. ¶ 13.)

22

23

24

1  **C.      Arbitration Proceeding**

2          Defendants and another investor, Kenneth Musser, Jr., commenced the FINRA arbitration

3  in November 2021. The final evidentiary hearing is set for March 20, 2023, in Seattle. (Def. Opp.

4  at 1.) Oppenheimer participated in discovery in the arbitration, serving its first discovery requests

5  in June 2022. (Supplemental Declaration of William E. Mahoney, Jr. at ¶¶ 3-4 (Dkt. No. 40).)

6  Defendants produced documents in response to the discovery on December 6, 2022. (Id. ¶ 5.)

7          The Court notes that Oppenheimer has not challenged the arbitration as to Musser.

8  According to Oppenheimer's answer to the arbitration claim Musser had accounts directly with

9  Oppenheimer and his monthly Oppenheimer statements reflected his investment in Horizon.

10  (Kuglar Decl. Ex. J at 4, 8 (Oppenheimer Answer).)

11                                    **ANALYSIS**

12  **A.      Subject Matter Jurisdiction**

13          The Court independently reviews whether it has subject matter jurisdiction over this

14  matter. See Ruhrgas AG v. Marathon Oil Co., 526 U.S. 574, 583 (1999). Oppenheimer alleges

15  that the Court has diversity jurisdiction under 28 U.S.C. § 1332(a) because the parties are diverse

16  and the amount in controversy exceeds $75,000. (Compl. ¶¶ 6-9.) The Court agrees. It is

17  uncontested that the parties are diverse. And where a lawsuit seeks declaratory or injunctive

18  relief, "it is well established that the amount in controversy is measured by the value of the

19  object of the litigation." Hunt v. Wash. State Apple Advert. Comm'n, 432 U.S. 333, 347 (1977);

20  Int'l Padi, Inc. v. Diverlink, No. 03–56478, 2005 WL 1635347, at *1 (9th Cir. July 13, 2005)

21  (unpublished). The object of the litigation here is the underlying arbitration, which involves

22  amounts well in excess of the $75,000 threshold. (See Compl. ¶ 16.) As such, the Court has

23  jurisdiction under 28 U.S.C. § 1332(a).

24

**B.      Preliminary Injunction Standard**

"A plaintiff seeking a preliminary injunction must show that: (1) she is likely to succeed on the merits, (2) she is likely to suffer irreparable harm in the absence of preliminary relief, (3) the balance of equities tips in her favor, and (4) an injunction is in the public interest." Farris v. Seabrook, 677 F.3d 858, 864 (9th Cir. 2012) (citing Winter v. NRDC, 555 U.S. 7, 20 (2008)); Garcia v. Google, Inc., 786 F.3d 733, 740 (9th Cir. 2015). A preliminary injunction is an "extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." Winter, 555 U.S. at 22. And it is "never awarded as of right." Id. In each case, the Court "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." Id.

The Ninth Circuit applies a "sliding scale" approach in considering the factors outlined in Winter. A stronger showing of one element may offset a weaker showing of another. All. for the Wild Rockies v. Cottrell, 632 F.3d 1127, 1131–32 (9th Cir. 2011). So "when the balance of hardships tips sharply in the plaintiff's favor, the plaintiff need demonstrate only 'serious questions going to the merits.'" hiQ Labs, Inc. v. LinkedIn Corp., 938 F.3d 985, 992 (9th Cir. 2019) (quoting All. for the Wild Rockies, 632 F.3d at 1135).

Below, the Court reviews the four Winter factors and then assesses whether a bond is necessary.

**C.      Likelihood of Success**

In this declaratory action, Oppenheimer must ultimately prove that Defendants were not its "customers" as that term is used under FINRA Rule 12200. To assess the likelihood of success, the Court first reviews the legal framework concerning the arbitrability decisions, case

1  law assessing the FINRA definition of "customer," and, finally, the law as applied to the facts of

2  this case.

3          **1.      Legal standards of arbitrability**

4          The Federal Arbitration Act ("FAA") provides that agreements to arbitrate "shall be

5  valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the

6  revocation of any contract." 9 U.S.C. § 2. This provision reflects "both a liberal federal policy

7  favoring arbitration, and the fundamental principle that arbitration is a matter of contract."

8  AT&T Mobility LLC v. Concepcion, 563 U.S. 333, 339 (2011) (citation and quotation omitted).

9  The Court places arbitration agreements on "equal footing with other contracts" and "enforce[s]

10 them according to their terms." Id. "Both the arbitrability of the merits of a dispute and the

11 question of who has the primary power to decide arbitrability depend on the agreement of the

12 parties." Reno, 747 F.3d at 738 (citing First Options of Chi., Inc. v. Kaplan, 514 U.S. 938, 943

13 (1995)). "But, unlike the arbitrability of claims in general, whether the court or the arbitrator

14 decides arbitrability is an issue for judicial determination unless the parties clearly and

15 unmistakably provide otherwise." Id. (quotation and citation omitted).

16         Here, the Court has the authority to determine arbitrability. The Parties agree that the

17 relevant "agreement" for the Court to review is FINRA Rule 12200, which binds members like

18 Oppenheimer to arbitrate disputes brought in certain circumstances. And Oppenheimer has

19 provided no "clear and unmistakable" evidence to rebut the presumption that the Court

20 determines arbitrability. Id., 747 F.3d at 739. As a result, "the liberal federal policy regarding the

21 scope of arbitrable issues is inapposite.'" Rajagopalan v. NoteWorld, LLC, 718 F.3d 844, 847

22 (9th Cir. 2013) (quoting Comer v. Micor, Inc., 436 F.3d 1098, 1104 n.11 (9th Cir. 2006)).

23

24

1    **2.    The meaning of "Customer" under FINRA Rule 12200**

2        "The relevant arbitration provision is FINRA Rule 12200, which requires FINRA

3    members like [Oppenheimer] to arbitrate disputes arising out of their business activities at the

4    request of a 'customer.'" <u>Reno</u>, 747 F.3d at 741. In relevant part,[1] FINRA Rule 12200 requires

5    Oppenheimer to arbitrate if: (1) "[r]equested by the customer"; (2) "[t]he dispute is between a

6    customer and a member or associated person of a member"; and (3) "[t]he dispute arises in

7    connection with the business activities of the member or the associated person, except disputes

8    involving the insurance business activities of a member that is also an insurance company."

9    FINRA Rule 12200.

10        The definition of the term "customer" requires some unpacking. "The FINRA Rules

11    define 'customer' only in the negative: 'A customer shall not include a broker or dealer.'" <u>Reno</u>,

12    747 F.3d at 739 (quoting FINRA Rule 12100(i)). The Ninth Circuit has defined "customer" to be

13    "a non-broker and non-dealer who purchases commodities or services from a FINRA member in

14    the course of the member's FINRA-regulated business activities, i.e., the member's investment

15    banking and securities business activities." <u>Reno</u>, 747 F.3d at 741. The Second Circuit has been

16    more explicit, creating a bright line rule: "[t]he only relevant inquiry in assessing the existence of

17    a customer relationship is whether an account was opened or a purchase made." <u>Citigroup Glob.</u>

18    <u>Markets Inc. v. Abbar</u>, 761 F.3d 268, 276 (2d Cir. 2014) (citation and quotation omitted). And

19    the Fourth Circuit similarly defines a "customer" as "one who purchases commodities or

20    services from a FINRA member." <u>Raymond James Fin. Servs., Inc. v. Cary</u>, 709 F.3d 382, 388

21    (4th Cir. 2013) (citation and quotation omitted).

22

23    ---------------

    [1] Because the parties agree that no separate written contract exists between Defendants and
24    Oppenheimer, the Court does not discuss this aspect of FINRA Rule 12200.

1    Though not expressly resolved by <u>Reno</u>, an investor who purchases commodities or

2    services from a FINRA member's "associated person" may also qualify as a "customer." FINRA

3    Rule 12200's plain language supports this conclusion because the Rule applies equally to "a

4    member or associated person of a member." And the Eleventh Circuit has expressly held that

5    "[w]hen an investor deals with a [FINRA] member's agent or representative, the investor deals

6    with the member." <u>Multi-Fin. Sec. Corp. v. King</u>, 386 F.3d 1364, 1370 (11th Cir. 2004). In <u>King</u>,

7    the court found that the investor was a "customer" of a National Association of Securities

8    Dealers, Inc. ("NASD")[2] member where "the parties agree[d] that King [the investor] was a

9    customer of Micciche [the registered advisor] and that Micciche was a person associated with

10   IFG [the NASD member]." <u>King</u>, 386 F.3d at 1368. The Court held that King was a "customer"

11   of the NASD member even though Micciche never reported his activities involving King or the

12   investments to IFG, IFG did not approve of the sale of the securities, IFG had no record of the

13   purchase of the investment by or for King, King never opened an account with IFG, King had no

14   written contract with IFG, and IFG did not receive or disburse funds for the transaction. <u>Id.</u> at

15   1366. The outcome in <u>King</u> is similar to a case from this District on which Defendants rely. <u>See</u>

16   <u>The O.N. Equity Sales Co. v. Venrick</u> (<u>ONESCO</u>), 508 F. Supp. 2d 872, 873 (W.D. Wash.

17   2007). In <u>ONESCO</u>, the investor was found to be a "customer" of an NASD member where the

18   investor purchased a security directly from a registered broker of the NASD member. <u>See</u> <u>id.</u> at

19   873-75. The investor was deemed a "customer" even though the registered broker had only

20   joined the NASD member a few weeks prior to the investment and had created the investment

21   scheme before joining the NASD member. <u>Id.</u> at 874-75.

22

23   _____

     [2] NSAD is the predecessor entity to FINRA. <u>See</u> <u>Reno</u>, 747 F.3d at 749 n.3 (Battaglia, J.,
24   concurring in part and dissenting in part).

### 3.    Factual analysis

The Court finds inadequate evidence that Defendants purchased their shares of Horizon from Woods or received services from him. As such, there is a strong likelihood that Oppenheimer will succeed on the merits of its declaratory action.

First, there is no evidence of any direct relationship between Oppenheimer and Defendants. Second, there is no evidence showing that Defendants purchased their interest in Horizon from Woods. Defendants argue that "[t]he evidence here is undisputed that [they] had dealings with and purchased securities from John Woods . . . while he was registered with Oppenheimer and transmitted funds to his company, Horizon." (Opp. at 12.) But there is no evidence to back up this statement. The Hoppers only state that they "made [their] initial investments in John Woods' investment program, Horizon Private Equity" in 2016. (See Declaration of J. Hopper ¶ 7; Declaration of L. Hopper ¶ 7.) But they do not state that they invested directly with Woods. And their account statements only show they had holdings in Horizon, not the entity or person from whom they bought the shares. The Mitchells appear to concede that they bought the securities from Mooney, not Woods, though their declarations are not so specific. (Opp. at 13 ("They were sold the securities by Woods's agent, Michael Mooney."); but see Declaration of D. Mitchell ¶ 9; Declaration of S. Mitchell ¶ 9 (stating only that they invested in Horizon, but not through whom).) On the record before it, the Court lacks any evidence that Defendants invested directly with Woods or that they received services from him.

Defendants argue that if they invested in Horizon they must have invested with Woods because Woods ran Horizon. The Court is not convinced by this argument. It does appear undisputed that Woods created Horizon and owned Southport Capital, for whom Mooney

1   worked. And through his "declaration," Mooney contends that he marketed Horizon to

2   Defendants at Woods' request, "reported back to John Woods and suggested that he send

3   Horizon subscription materials to them, which they completed and returned to John Woods at the

4   Oppenheimer Atlanta branch offices." (Mooney Decl. ¶¶ 8, 11.) But this declaration is not sworn

5   under penalty of perjury, as is required by 28 U.S.C. § 1746. Mooney only says he was "duly

6   cautioned and sworn according to the law," which is not a clear declaration under penalty of

7   perjury. (Id. at 1.) Even if the Court accepted this as a sworn statement, Mooney does not state

8   that Defendants purchased their interest in Horizon from Woods. And Defendants provide no

9   evidence that they did. Indeed, the Mitchells assert they bought into Horizon from Mooney, not

10  Woods. (See Opp. at 13.) The Court is not convinced this is sufficient evidence to conclude

11  Defendants purchased their interest in Horizon from Woods, as is required to show they are

12  "customers."

13         Defendants try to fill in these gaps by suggesting that because Mooney was an agent of

14  Woods and Southport, any investment through Mooney was an investment with Woods. But

15  Defendants cite to no case law to support this agency theory. Instead, they contrast their case to

16  NYLIFE Sec., LLC v. Duhame, where the court enjoined an arbitration given the absence of

17  evidence that the registered agent of a FINRA member had a relationship to the purchase of the

18  securities at issue. No. 20-CV-07413-JSC, 2020 WL 7075599, at *1 (N.D. Cal. Dec. 3, 2020). In

19  Duhame, the registered broker was the father of a Ponzi-scheme perpetrator and "was merely a

20  friend from a local café who recommended a bad investment" and had no other involvement. Id.,

21  at *3. Duhame does not aid Defendants because it does not suggest that an agent of a registered

22  broker can bind the FINRA member or that an investment with the agent of a registered broker is

23  equivalent to an investment with the registered broker for purposes of FINRA Rule 12200. In

24

contrast, the Fourth Circuit in <u>Cary</u> suggested that this agency theory does not hold water. In that case, the Court rejected finding the investors "customers," where they bought the securities at issue from a business associate of the member's registered broker, even though the registered broker received a commission from the sale. <u>Cary</u>, 709 F.3d at 386-87. The Court reasoned that there was insufficient evidence to find any apparent authority to bind the FINRA member. <u>Id.</u> at 387-88 (citing Restatement (Second) of Agency § 27). Similarly, Defendants have pointed to no evidence that Mooney had apparent authority to act as Oppenheimer's agent or as Woods' agent in his capacity as a registered broker of Oppenheimer. <u>See</u> Restatement (Third) Of Agency § 3.15 (2006) ("An agent may appoint a subagent only if the agent has actual or apparent authority to do so"). The Court declines to accept Defendants' unsupported agency theory in the context of FINRA Rule 12200.

In summary, the Court finds a strong likelihood that Oppenheimer will succeed on the merits its claim because there is insufficient evidence to show that Defendants were "customers" of Oppenheimer or Woods.

**D.    Irreparable Harm**

Oppenheimer correctly argues that it will be irreparably harmed if it is forced to spend money and human resources on claims it should not have to arbitrate and for which it cannot recover the costs. "Typically, monetary harm does not constitute irreparable harm." <u>Calif. Pharmacists Ass'n v. Maxwell–Jolly</u>, 563 F.3d 847, 852 (9th Cir. 2009), <u>vacated on other grounds sub nom.</u> <u>Douglas v. Indep. Living Ctr. of So. Calif., Inc.</u>, 565 U.S. 606 (2012). But time and resources spent in arbitration constitute irreparable harm where neither the arbitration agreement nor the Arbitration Act allows for monetary awards of attorneys' fees and costs. <u>Maryland Cas. Co. v. Realty Advisory Bd. on Lab. Rels.</u>, 107 F.3d 979, 985 (2d Cir. 1997). There is no evidence presented that Oppenheimer could recover its fees or costs if successful in

1    the arbitration. And it is uncontroverted that Oppenheimer will incur additional costs in

2    defending the arbitration against all five claimants instead of just one.

3           Oppenheimer also correctly argues that it will be irreparably injured if it is forced to

4    arbitrate when it does not have to. Forcing a party to arbitrate may cause an irreparable injury if

5    the party being compelled is not required to arbitrate, even if the arbitration award can be set

6    aside. McLaughlin Gormley King Co. v. Terminix Int'l Co., L.P., 105 F.3d 1192, 1194 (8th Cir.

7    1997). Indeed, "'several courts have held that forcing a party to arbitrate a dispute that it did not

8    agree to arbitrate constitutes per se irreparable harm." Morgan Keegan & Co. v. McPoland, 829

9    F. Supp. 2d 1031, 1036 (W.D. Wash. 2011) (quoting Chicago Sch. Reform Bd. of Trs. v.

10   Diversified Pharm. Servs., Inc., 40 F. Supp. 2d 987, 996 (N.D. Ill. 1999)). The Court agrees with

11   Oppenheimer that this is another source of irreparable harm.

12   **E.    Equities**

13          The equitable considerations favor Oppenheimer. Forcing a party to engage in arbitration

14   where that party is not bound to arbitrate serves no equitable purpose. And while Oppenheimer

15   will have to participate in the arbitration regardless of the outcome of this case, that fact is not

16   dispositive. If Oppenheimer is not bound to arbitrate Defendants' claim, then it would be

17   inequitable to force them to do so even if it will be arbitrating another similar claim. And

18   Defendants have not identified any particularly adverse consequence that will result from

19   issuance of a preliminary injunction. A delay in the arbitration does not appear to impose any

20   specific harm or inequitable outcome. These facts all weigh in Oppenheimer's favor.

21          The Court notes that Oppenheimer did not expediently seek relief of Court, a fact that

22   weighs against it when considering the equities. The arbitration commenced in November 2021,

23   and although Oppenheimer knew it had no accounts or business relationship with Defendants

24

1    long ago, it waited until June 2022 to begin seeking discovery from Defendants. There is nothing

2    in the record explaining this delay or why Oppenheimer did not move more quickly to obtain all

3    necessary evidence from Defendants to vindicate its rights. But this fact alone does not convince

4    the Court that the balance of the equities disfavor Oppenheimer. It did move relatively quickly to

5    seek a preliminary injunction once it received records from Defendants in December 2022. This

6    tempers, somewhat, the delay it appears to have caused. And it does not outweigh the overall

7    equitable balance, which the Court finds favors Oppenheimer.

8    **F.    Public Interest**

9          There is no public interest in compelling Oppenheimer to arbitrate if it does not have to.

10   See Duhame, 2020 WL 7075599, at *4. While the FINRA rules are intended to help investors,

11   they should not be applied in a manner that would coerce FINRA members to arbitrate claims

12   when they do not have to. Accordingly, the Court finds this factor this favors Oppenheimer.

13                                          *        *        *

14         The Court finds that the four Winter factors favor issuance of the preliminary injunction.

15   Oppenheimer has shown a strong likelihood of success on the merits, that it faces irreparable

16   harm without the injunction, and that both the equities and public interest tilt in its favor. The

17   Court therefore GRANTS the Motion for Preliminary Injunction.

18   **G.    Bond**

19         Federal Rule of Civil Procedure 65(c) states that: "The court may issue a preliminary

20   injunction or a temporary restraining order only if the movant gives security in an amount that

21   the court considers proper to pay the costs and damages sustained by any party found to have

22   been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). But a district court "may dispense

23   with the filing of a bond when it concludes there is no realistic likelihood of harm to the

24

1  defendant from enjoining his or her conduct." <u>Jorgensen v. Cassiday</u>, 320 F.3d 906, 919 (9th Cir.

2  2003).

3        The Court here finds that no bond is necessary. Defendants have not identified any costs

4  or damages that they will incur by having the arbitration delayed as to their claims. There

5  appears no realistic likelihood of harm to Defendants from issuance of the injunction. On the

6  record before it, the Court finds that no bond is necessary under Rule 65(c).

7  **CONCLUSION**

8        The Court finds that all four <u>Winter</u> factors favor Oppenheimer and that a preliminary

9  injunction is the appropriate remedy. The Court GRANTS Oppenheimer's Motion for

10  Preliminary Injunction and hereby ENJOINS Defendants from compelling Oppenheimer to

11  defend the claims they assert against it in the FINRA arbitration. No bond shall be required. But

12  the Court notes that this Order does not resolve the merits of this dispute.

13        Separately, the Court recommends Defendants evaluate whether they wish to withdraw

14  their Motion to Compel Arbitration in light of this Order. (<u>See</u> Dkt. No. 42.) The Court makes

15  this observation given that the Motion to Compel is presented as "the flip side of Oppenheimer's

16  Injunction Motion" and is based entirely on the arguments and materials submitted in opposition

17  to the Motion for Preliminary Injunction. (Mot. at 2.) The Court also notes that Defendants'

18  counsel represented at the March 8th hearing that he would like to engage in discovery. This

19  suggests that the proper means to resolve this action is through summary judgment and, if

20  necessary, trial, not a motion to compel based on the existing record and briefing concerning the

21  preliminary injunction.

22      \\

23      \\

24

The clerk is ordered to provide copies of this order to all counsel.

Dated March 9, 2023.

Marsha J. Pechman
United States Senior District Judge