1
2
3
4
5
6
7
8

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

9

10   OPPENHEIMER & CO. INC.,                 CASE NO. C23-67 MJP

11                        Plaintiff,          ORDER ON CROSS-MOTIONS
                                              FOR SUMMARY JUDGMENT
12              v.

13   STEVEN MITCHELL, DORI
     MITCHELL, JEROME HOPPER, and
14   LORI HOPPER,

15                        Defendants.

16

17        This matter comes before the Court on Plaintiff's Motion for Summary Judgment and

18   Defendants' Motion for Summary Judgment. (Dkt. Nos. 69, 71.) Having reviewed the Motions,

19   the Responses (Dkt. Nos. 76, 78), the Replies (Dkt. Nos. 80, 81), and all supporting materials,

20   the Court GRANTS Plaintiff's Motion and DENIES Defendants' Motion.

21                                       **BACKGROUND**

22        Plaintiff Oppenheimer & Co., Inc. filed this declaratory judgment action to avoid having

23   to arbitrate claims that the four Defendants assert against it in a Financial Industry Regulatory

24

1   Authority (FINRA) arbitration. (See Complaint ¶ 67 (Dkt. No. 1).) Oppenheimer is a member of

2   FINRA, which is "a non-governmental, self-regulatory agency that has the authority to exercise

3   comprehensive oversight over all securities firms that do business with the public." See

4   Goldman, Sachs & Co. v. City of Reno, 747 F.3d 733, 737 (9th Cir. 2014). Defendants

5   commenced the arbitration to recover funds they invested and lost in a private equity fund called

6   Horizon Private Equity III LLC ("Horizon") that an Oppenheimer-registered broker, John

7   Woods, created and operated as a Ponzi scheme.

8        The Parties have now filed cross-motions for summary judgment, which ultimately

9   requires the Court to examine whether the FINRA arbitration was properly commenced against

10  Oppenheimer. The parties agree the Defendants can only force Oppenheimer to arbitrate if they

11  were Oppenheimer's "customers," as that term is used by FINRA Rule 12200. Although the

12  FINRA rule defines "customer" with great breadth, the Ninth Circuit has narrowed its reach to

13  include only those who "purchase[] commodities or services from a FINRA member [or

14  associated person of the FINRA member] in the course of the member's FINRA-regulated

15  business activities, i.e., the member's investment banking and securities business activities."

16  FINRA Rule 12200, Reno, 747 F.3d at 741. To understand whether Defendants are "customers"

17  of Oppenheimer, the Court reviews the facts surrounding the Horizon Ponzi scheme and

18  Defendants' investment in Horizon.

19  **A.      John Woods and the Horizon Fund**

20       The four Defendants and one other individual commenced a FINRA arbitration

21  proceeding against Oppenheimer, which is a member of FINRA. (Declaration of William E.

22  Mahoney, Jr. Ex. A (Dkt. No. 23) (Statement of Claim).) In the arbitration, Defendants allege

23  that from 2003 through the end of 2016, an Oppenheimer broker, John Woods, operated Horizon

24

as a Ponzi scheme that sold $110 million to the public, including over several million dollars to Defendants. (Id. at 1-2.) They allege that Woods created Horizon while at Oppenheimer and that Woods convinced the public to invest given his status as a registered broker of Oppenheimer.

The Parties have now provided further information concerning John Woods and the entities related to the Ponzi scheme. First, it is undisputed that Woods was a registered broker of Oppenheimer until December 2016. (Declaration of Craig H. Kuglar ¶ 5 & Ex. B at 3 (Dkt. No. 33).) Second, it is undisputed that Woods controlled and had use of the funds invested into Horizon. (SEC Complaint ¶ 17 (Ex. A to the Declaration of Craig Kuglar (Dkt. No. 33) ("First Kuglar Decl."); Woods' Answer to the SEC Complaint ¶ 1 (Ex. D to the Declaration of Craig Kuglar ISO Defs. MSJ (Dkt. No. 70) ("Second Kuglar Decl." SEC Compl. ¶ 17; Woods' Answer to SEC Compl. ¶ 17.) Third, Woods owned and controlled Livingston Group Asset Management Company d/b/a Southport Capital ("Southport"), a registered investment adviser firm that helped generate investments in Horizon. (See SEC Complaint ¶ 1; Woods' Answer to the SEC Compl. ¶ 1.) As is relevant here, Southport employed Michael Mooney, a former Oppenheimer broker who worked to sell investments in Horizon. (Deposition of Michale Mooney at 55-56 (Ex. J to Second Kuglar Decl.).) Mooney earned commissions from Horizon for any investments he helped facilitate in the fund, and he also received fee income from Southport for such investments. (Id. at 55-57.)

**B.    Defendants' Investments in Horizon**

Resolution of the pending motion turns largely on an assessment of how Defendants came to invest in Horizon and whether they purchased their interests in the fund from Woods. The Court therefore examines the facts surrounding the purchases in some detail.

Defendants Steven and Dori Mitchell allege that they lost their $1.6 million investment in Horizon after being told by "Woods' agent, Michael Mooney, that Horizon was a safe, low-risk investment." (Statement of Claim at 2.) Both Mitchells testified at their depositions that Mooney advised them Horizon was a safe investment in part because of Woods' long track-record with Oppenheimer. (Deposition of Dori Mitchell at 44; Deposition of Steven Mitchell at 30.) Mooney confirmed that he spoke to the Mitchells, advised them he worked for Southport, and told them that investing in Horizon was "a good investment for them." (Mooney Dep. at 80.) He also testified that he was their investment advisor at Southport with respect to the Horizon investment. (Id. at 52.) The Mitchells provide little evidence of any interactions with Woods. At most, the Mitchells claim that after they invested, Woods sent them Seahawks tickets as a "thank you, and that Woods countersigned their subscription agreement into Horizon—though it has not been provided to the Court. (D. Mitchell Decl. ¶ 10; S. Mitchell Decl. ¶ 10; D. Mitchell Dep. at 101.) But neither of the Mitchells met with Woods, corresponded with him, or spoke to him. (D. Mitchell Dep. at 44-45; Deposition of S. Mitchell at 30.) And Dori Mitchell testified that in order to invest in Horizon, she caused funds to move from certain third-party accounts into Provident Trust, which then purchased and held their interests in Horizon. (D. Mitchell Dep. at 54, 63-64, 106.) The Mitchells also confirmed that Oppenheimer was not involved in the purchase or holding of their Horizon investments. (Id. at 64.)

Defendants Jerome and Lori Hopper invested $600,000 in Horizon in 2016 after being pitched by "Oppenheimer financial advisor John Woods and Michael Mooney" that the investment was 'virtually risk-free.'" (Statement of Claim at 3, 5.) Jerome Hopper spoke with Woods about Horizon at some point before making his initial investment. (Dep. of J. Hopper at 60-61, 63.) But the Hoppers admit that they did not invest through Oppenheimer and the only

1    materials they received about Horizon came from Mooney. (J. Hopper Dep. 47-48.) Instead, the

2    Hoppers testified that their Horizon investment was custodied at Provident Trust and that

3    Southport was the investment advisor on their investment in Horizon and that it received fees

4    from the investment. (J. Hopper Dep. at 53, 54, 58; Dep. of L. Hopper at 38.) Like the Mitchells,

5    the Hoppers testified that Mooney was the broker who helped them make the investment. (L.

6    Hopper Dep. at 39.) As with the Mitchells, the Hoppers provide no evidence that they purchased

7    any interest in Horizon directly from Woods or Oppenheimer.

8          The Court reviews briefly what the Parties have explained regarding Provident Trust, the

9    entity that allowed the Defendants to make their investments in Horizon. According to the SEC's

10   complaint against Woods, Southport employees helped Horizon investors create accounts with

11   Provident Trust to purchase interests in Horizon. (SEC Compl. ¶ 36; Woods' Answer ¶ 36.)

12   Ultimately, Provident Trust would then pass investor funds to Horizon's bank account. (Id.)

13   Mooney testified that he would not assist clients with the mechanics of the investment, and

14   instead call Iris Israel at Oppenheimer to get the paperwork to the investor. (Mooney Dep. at 26-

15   27.) But Mooney's testimony was not specific as to the time frame. Defendants claim that "John

16   Woods then directed Provident Trust to deposit new investor funds into Horizon bank accounts."

17   (Defs.  MSJ at 13 (citing SEC Compl. ¶ 38 & Woods' Answer ¶ 38).) But the information

18   Defendants cite to as support for this statement says only that "[w]hen it first established a

19   relationship with the Trust Company [Provident] in 2015, Woods and Southport directed the

20   Trust Company to deposit new investor funds to bank accounts in the name of Horizon." (SEC

21   Compl. ¶ 38; see Woods' Answer ¶ 38.) There is therefore no evidence in the record that Woods

22   himself directed Provident with regard to Defendants' investment into Horizon.

23

24

**C.      Procedural History**

The Court previously entered a preliminary injunction in this matter, preventing Defendants' arbitration claims to proceed. (Dkt. No. 49.) Oppenheimer now asks the Court to convert the preliminary injunction into a permanent injunction.

**ANALYSIS**

**A.      Subject Matter Jurisdiction**

The Court independently reviews whether it has subject matter jurisdiction over this matter. See Ruhrgas AG v. Marathon Oil Co., 526 U.S. 574, 583 (1999). Oppenheimer alleges that the Court has diversity jurisdiction under 28 U.S.C. § 1332(a) because the parties are diverse and the amount in controversy exceeds $75,000. (Compl. ¶¶ 6-9.) The Court agrees. It is uncontested that the parties are diverse. And where a lawsuit seeks declaratory or injunctive relief, "it is well established that the amount in controversy is measured by the value of the object of the litigation." Hunt v. Wash. State Apple Advert. Comm'n, 432 U.S. 333, 347 (1977); Int'l Padi, Inc. v. Diverlink, No. 03–56478, 2005 WL 1635347, at *1 (9th Cir. July 13, 2005) (unpublished). The object of the litigation here is the underlying arbitration, which involves amounts well in excess of the $75,000 threshold. (See Compl. ¶ 16.) As such, the Court has jurisdiction under 28 U.S.C. § 1332(a).

**B.      Legal Standards**

The Federal Arbitration Act ("FAA") provides that agreements to arbitrate "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. This provision reflects "both a liberal federal policy favoring arbitration, and the fundamental principle that arbitration is a matter of contract." AT&T Mobility LLC v. Concepcion, 563 U.S. 333, 339 (2011) (citation and quotation omitted).

1    The Court places arbitration agreements on "equal footing with other contracts" and "enforce[s]

2    them according to their terms." Id. "Both the arbitrability of the merits of a dispute and the

3    question of who has the primary power to decide arbitrability depend on the agreement of the

4    parties." Reno, 747 F.3d at 738 (citing First Options of Chi., Inc. v. Kaplan, 514 U.S. 938, 943

5    (1995)). "But, unlike the arbitrability of claims in general, whether the court or the arbitrator

6    decides arbitrability is an issue for judicial determination unless the parties clearly and

7    unmistakably provide otherwise." Id. (quotation and citation omitted).

8         Here, the Court has the authority to determine arbitrability. The Parties agree that the

9    relevant "agreement" for the Court to review is FINRA Rule 12200, which binds members like

10   Oppenheimer to arbitrate disputes brought in certain circumstances. And Oppenheimer has

11   provided no "clear and unmistakable" evidence to rebut the presumption that the Court

12   determines arbitrability. Id., 747 F.3d at 739. As a result, "the liberal federal policy regarding the

13   scope of arbitrable issues is inapposite.'" Rajagopalan v. NoteWorld, LLC, 718 F.3d 844, 847

14   (9th Cir. 2013) (quoting Comer v. Micor, Inc., 436 F.3d 1098, 1104 n.11 (9th Cir. 2006)).

15        "The relevant arbitration provision is FINRA Rule 12200, which requires FINRA

16   members like [Oppenheimer] to arbitrate disputes arising out of their business activities at the

17   request of a 'customer.'" Reno, 747 F.3d at 741. In relevant part,[1] FINRA Rule 12200 requires

18   Oppenheimer to arbitrate if: (1) "[r]equested by the customer"; (2) "[t]he dispute is between a

19   customer and a member or associated person of a member"; and (3) "[t]he dispute arises in

20   connection with the business activities of the member or the associated person, except disputes

21

22

23   _____
     [1] Because the parties agree that no separate written contract exists between Defendants and

24   Oppenheimer, the Court does not discuss this aspect of FINRA Rule 12200.

1    involving the insurance business activities of a member that is also an insurance company."

2    FINRA Rule 12200.

3          The definition of the term "customer" requires some unpacking. "The FINRA Rules

4    define 'customer' only in the negative: 'A customer shall not include a broker or dealer.'" Reno,

5    747 F.3d at 739 (quoting FINRA Rule 12100(i)). The Ninth Circuit has defined "customer" to be

6    "a non-broker and non-dealer who purchases commodities or services from a FINRA member in

7    the course of the member's FINRA-regulated business activities, i.e., the member's investment

8    banking and securities business activities." Reno, 747 F.3d at 741. The Second Circuit has been

9    more explicit, creating a bright line rule: "[t]he only relevant inquiry in assessing the existence of

10   a customer relationship is whether an account was opened or a purchase made." Citigroup Glob.

11   Markets Inc. v. Abbar, 761 F.3d 268, 276 (2d Cir. 2014) (citation and quotation omitted). And

12   the  Fourth Circuit similarly defines a "customer" as "one who purchases commodities or

13   services from a FINRA member." Raymond James Fin. Servs., Inc. v. Cary, 709 F.3d 382, 388

14   (4th Cir. 2013) (citation and quotation omitted).

15         Though not expressly resolved by Reno, an investor who purchases commodities or

16   services from a FINRA member's "associated person" may also qualify as a "customer." FINRA

17   Rule 12200's plain language supports this conclusion because the Rule applies equally to "a

18   member or associated person of a member." And the Eleventh Circuit has expressly held that

19   "[w]hen an investor deals with a [FINRA] member's agent or representative, the investor deals

20   with the member." Multi-Fin. Sec. Corp. v. King, 386 F.3d 1364, 1370 (11th Cir. 2004). In King,

21   the court found that the investor was a "customer" of a National Association of Securities

22

23

24

1  Dealers, Inc. ("NASD")[2] member where "the parties agree[d] that King [the investor] was a

2  customer of Micciche [the registered advisor] and that Micciche was a person associated with

3  IFG [the NASD member]." King, 386 F.3d at 1368. The Court held that King was a "customer"

4  of the NASD member even though Micciche never reported his activities involving King or the

5  investments to IFG, IFG did not approve of the sale of the securities, IFG had no record of the

6  purchase of the investment by or for King, King never opened an account with IFG, King had no

7  written contract with IFG, and IFG did not receive or disburse funds for the transaction. Id. at

8  1366. The outcome in King is similar to a case from this District on which Defendants rely. See

9  The O.N. Equity Sales Co. v. Venrick (ONESCO), 508 F. Supp. 2d 872, 873 (W.D. Wash.

10 2007). In ONESCO, the investor was found to be a "customer" of an NASD member where the

11 investor purchased a security directly from a registered broker of the NASD member. See id. at

12 873-75. The investor was deemed a "customer" even though the registered broker had only

13 joined the NASD member a few weeks prior to the investment and had created the investment

14 scheme before joining the NASD member. Id. at 874-75.

15 **C.    Defendants Not Customers of Woods**

16      Defendants have failed to produce any evidence they purchased their interests in Horizon

17 through or from Woods or Oppenheimer and they cannot be considered "customers" under

18 FINRA Rule 12200.

19      First, Defendants have provided no evidence that they held any accounts with

20 Oppenheimer or that they are direct customers of Oppenheimer.

21

22

23 ---

[2] NSAD is the predecessor entity to FINRA. See Reno, 747 F.3d at 749 n.3 (Battaglia, J.,
24 concurring in part and dissenting in part).

1    Second, Defendants identify no evidence that they purchased any commodity or service

2   from Woods while he was associated with Oppenheimer. Critically, Defendants fail to show that

3   Woods had any personal involvement in either the Mitchell's or the Hopper's investment in

4   Horizon. Although Jerome Hopper testified that he spoke to Woods before investing, the

5   evidence shows that it was Mooney who facilitated the purchase as the investment advisor to the

6   Hoppers. (Mooney Dep. at 52.) Mooney similarly acted as the investment advisor to the

7   Mitchells to make their investment. (Id.) None of the Defendants testified that they spoke with

8   Woods or that Woods acted as their broker or advisor in making their investments in Horizon.

9   And while Mooney testified generally that he acted at Woods' direction to sell interests in

10  Horizon, there is no evidence that Woods specifically directed the transactions. Mooney acted

11  for himself as a Southport employee, acting as the investment advisor to Defendants at

12  Southport, obtaining a commission from Horizon, and earning fees from Southport. (Mooney

13  Dep. at 55-56, 58.)[3] Nor have Defendants shown that Woods had any role in facilitating the

14  purchase through Provident Trust. It is true that Defendants placed their investment funds into

15  accounts at Provident Trust that then completed the purchases of interests in Horizon. But there

16  is nothing in the record to suggest that Woods was involved in those transactions. Defendants

17  certainly argue that Woods had some role, but the evidence does not support the claim. (Defs.

18  MSJ at 13.) Rather, the evidence on which Defendants rely on shows that in 2015 Woods was

19  involved in directing Provident "to deposit new investor funds to bank accounts in the name of

20  Horizon." (SEC Compl. ¶ 38; see Woods' Answer ¶ 38.) But there is no evidence that Woods

21  actually directed Provident to complete the transactions for either the Mitchells or the Hoppers.

22

23  [3] After the Court rejected Defendants' agency theory, Defendants no longer content that Mooney
    acted as Woods' agent and therefore Woods they were effectively customers of Woods. (See
24  Order at 12-13 (Dkt. No. 49).)

1    On this record, there simply is no evidence of Woods' participation such that the Court could

2    conclude he sold Defendants any commodities or services as required to be "customers" under

3    FINRA Rule 12200.

4          The Court also rejects Defendants' argument that because Horizon and Southport were

5    Woods' "alter egos," Defendants necessarily purchased their interests in Horizon from Woods.

6    The Court previously dismissed Defendants' theory that any investment in Horizon or through

7    Southport must also be considered a purchase from Woods because Woods ran and owned

8    Horizon and Southport. (See Order on Mot. for Prelim. Inj. at 11-12 (rejecting this same theory).)

9    The Court finds insufficient reasons to reconsider this determination. There is some tenuous

10   logical appeal to Defendants' alter-ego theory—i.e., if Woods ultimately benefitted financially

11   from Defendants' investment in Horizon, one could say that Defendants purchased a commodity

12   from Woods. But this argument does not track the FINRA rule, which defines a "customer" as

13   someone who purchases a commodity or received a service from a broker or its registered agent.

14   FINRA Rule 12200. The Rule focuses on the broker's action in facilitating the purchase, not on

15   the entity or person who may have derived an ultimate financial benefit from the investment. See

16   Reno, 747 F3d at 741; King, 386 F.3d at 1370 (noting that the focus is on whether "the investor

17   deals with the [FINRA] member"). Ultimately, Defendants' argument would lead to rather

18   absurd results. For example, under Defendants' theory, if a person invested through a registered

19   broker in a publicly-traded stock, the investor would be a "customer" under FINRA Rule 12200

20   of the company whose stock they purchased. That makes little sense, particularly given that

21   FINRA "has the authority to exercise comprehensive oversight over all securities firms that do

22   business with the public," not the ultimate investments in which the public invests. Reno, 747

23   F.3d at 737 (emphasis added). Focusing here on who actually sold the investments in Horizon,

24

1   the record shows that it was Mooney who facilitated and caused the investments to occur, not

2   Woods. He was the investment advisor to both sets of Defendants and earned his fees and

3   commissions in so doing. (Mooney Dep. at 52, 58.) So while Woods benefitted from the

4   investments, he has not been shown to have any active role in the actual purchases. Without such

5   evidence, the Court remains unconvinced that Defendants qualify as purchasers of commodities

6   from Woods, as is required to be a "customer" under the FINRA rule.

7          The Court therefore GRANTS Oppenheimer's Motion and DENIES Defendants' Motion.

8   Oppenheimer is entitled to complete relief on declaratory judgment action, and DECLARES that

9   Oppenheimer has no obligation to arbitrate any and all claims Defendants asserted or could have

10  asserted against Oppenheimer in the FINRA arbitration Mitchell v. Oppenheimer & Co. Inc.,

11  FINRA Arb. No. 21-02818..

12  **D.     Permanent Injunction**

13         The Court finds that Oppenheimer is entitled to a permanent injunction barring

14  Defendants from pursuing their claims in a FINRA arbitration.

15         "'[A] plaintiff seeking a permanent injunction must satisfy a four-factor test before a

16  court may grant such relief. A plaintiff must demonstrate: (1) that it has suffered an irreparable

17  injury; (2) that remedies available at law, such as monetary damages, are inadequate to

18  compensate for that injury; 3) that, considering the balance of hardships between the plaintiff and

19  defendant, a remedy in equity is warranted; and (4) that the public interest would not be

20  disserved by a permanent injunction.'" Monsanto Co. v. Geertson Seed Farms, 561 U.S. 139,

21  156–57 (2010)  (quoting eBay Inc. v. MercExchange, L.L.C., 547 U.S. 388, 391 (2006)).

22         First, without a permanent injunction, Oppenheimer will suffer an irreparable injury that

23  cannot be compensated through other remedies available at law. First, Oppenheimer will be

24

1   irreparably harmed if it is forced to spend money and human resources on claims it should not

2   have to arbitrate and for which it cannot recover the costs. "Typically, monetary harm does not

3   constitute irreparable harm." <u>Calif. Pharmacists Ass'n v. Maxwell–Jolly</u>, 563 F.3d 847, 852 (9th

4   Cir. 2009), <u>vacated on other grounds sub nom.</u> <u>Douglas v. Indep. Living Ctr. of So. Calif., Inc.</u>,

5   565 U.S. 606 (2012). But time and resources spent in arbitration constitute irreparable harm

6   where neither the arbitration agreement nor the Arbitration Act allows for monetary awards of

7   attorneys' fees and costs. <u>Maryland Cas. Co. v. Realty Advisory Bd. on Lab. Rels.</u>, 107 F.3d 979,

8   985 (2d Cir. 1997). There is no evidence presented that Oppenheimer could recover its fees or

9   costs if successful in the arbitration. And it is uncontroverted that Oppenheimer will incur

10   additional costs in defending the arbitration against all five claimants instead of just one. As

11   such, this is an irreparable harm. Second, Oppenheimer would also be irreparably injured if it is

12   forced to arbitrate when it does not have to. Forcing a party to arbitrate may cause an irreparable

13   injury if the party being compelled is not required to arbitrate, even if the arbitration award can

14   be set aside. <u>McLaughlin Gormley King Co. v. Terminix Int'l Co., L.P.</u>, 105 F.3d 1192, 1194

15   (8th Cir. 1997). Indeed, "'several courts have held that forcing a party to arbitrate a dispute that it

16   did not agree to arbitrate constitutes per se irreparable harm." <u>Morgan Keegan & Co. v.</u>

17   <u>McPoland</u>, 829 F. Supp. 2d 1031, 1036 (W.D. Wash. 2011) (quoting <u>Chicago Sch. Reform Bd.</u>

18   <u>of Trs. v. Diversified Pharm. Servs., Inc.</u>, 40 F. Supp. 2d 987, 996 (N.D. Ill. 1999)).

19         Second, the equities here favor Oppenheimer. Forcing a party to engage in arbitration

20   where that party is not bound to arbitrate serves no equitable purpose. If Oppenheimer is not

21   bound to arbitrate Defendants' claim, then it would be inequitable to force them to do so. And

22   Defendants have not identified any particularly adverse consequence that will result from

23   issuance of the permanent injunction.

24

1    Third, there is no public interest in compelling Oppenheimer to arbitrate if it does not

2    have to. See <u>NYLIFE Sec., LLC v. Duhame</u>, No. 20-CV-07413-JSC, 2020 WL 7075599, at *4

3    (N.D. Cal. Dec. 3, 2020). While the FINRA rules are intended to help investors, they should not

4    be applied in a manner that would coerce FINRA members to arbitrate claims when they do not

5    have to. Accordingly, the Court finds this factor this favors Oppenheimer.

6    Having considered the relevant factors, the Court finds that Oppenheimer is entitled to a

7    permanent injunction. The Court therefore PERMANENTLY ENJOINS Defendants from

8    arbitrating against Oppenheimer any claims they asserted or could have asserted against

9    Oppenheimer in the FINRA arbitration <u>Mitchell v. Oppenheimer & Co. Inc.</u>, FINRA Arb. No.

10   21-02818.

11                                    **CONCLUSION**

12   Oppenheimer has demonstrated that Defendants are not "customers," as that term is

13   defined in FINRA Rule 12200. As such, Oppenheimer is entitled to the declaratory relief and

14   permanent injunction they seek. The Court GRANTS Oppenheimer's Motion for Summary

15   Judgment and DENIES Defendants' Motion for Summary Judgment. The Court DECLARES

16   that Oppenheimer has no obligation to arbitrate any and all claims Defendants asserted or could

17   have asserted against Oppenheimer in the FINRA arbitration <u>Mitchell v. Oppenheimer & Co.</u>

18   <u>Inc.</u>, FINRA Arb. No. 21-02818. And the Court PERMANENTLY ENJOINS Defendants from

19   arbitrating against Oppenheimer any claims they asserted or could have asserted against

20   Oppenheimer in the FINRA arbitration <u>Mitchell v. Oppenheimer & Co. Inc.</u>, FINRA Arb. No.

21   21-02818.

22   \\

23   \\

24

The clerk is ordered to provide copies of this order to all counsel.

Dated April 5, 2024.

Marsha J. Pechman
United States Senior District Judge